UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                :
JOHN K. WALLACE         :       3:17 CV 672 (RMS)
                :
V.                   :
                :
NANCY A. BERRYHILL,     :
ACTING COMMISIONER OF   :
SOCIAL SECURITY[1]      :       DATE: SEPT. 6, 2018
                :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

Disability Insurance benefits ["DIB"] and Supplemental Security Income benefits ["SSI"].

I.    ADMINISTRATIVE PROCEEDINGS

On or about December 6, 2010, the plaintiff filed an application for DIB and SSI benefits

claiming he has been disabled since January 15, 2008, due to manic depression and bipolar

disorder. (Certified Transcript of Administrative Proceedings, dated June 6, 2017 ["Tr."] 344-56,

411). The plaintiff's application was denied initially (Tr. 234-41; *see* Tr. 242-45) and upon

reconsideration. (Tr. 246-51). On January 19, 2012, the plaintiff requested a hearing before an

Administrative Law Judge ["ALJ"] (Tr. 252-58), and on November 14, 2012, a hearing was held

before ALJ Ronald J. Thomas, at which the plaintiff and the plaintiff's mother testified. (Tr. 44-

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. § 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

74). On December 27, 2012, ALJ Thomas issued an unfavorable decision denying the plaintiff's claims for benefits. (Tr. 206-28). On February 15, 2013, the plaintiff submitted a request for review of the hearing decision (Tr. 433-34), and on March 28, 2014, the Appeals Council granted the plaintiff's request, vacating the December 27, 2012 decision, and remanding the matter for subsequent proceedings.[2] (Tr. 229-33).

A second hearing was held before ALJ Thomas on June 26, 2015, at which the plaintiff, his treating physician, Dr. John Nowicki, and Howard Steinberg, a vocational expert, testified. (Tr. 75-132). On October 27, 2015, ALJ Thomas issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 9-43). The same day, the plaintiff requested review of the hearing decision (Tr. 7), and, on February 24, 2017, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On April 24, 2017, the plaintiff filed his complaint in this pending action (Doc. No. 1),[3] and on June 26, 2017, the defendant filed her answer and administrative transcript, dated June 6, 2017. (Doc. No. 12). On July 12, 2017, the parties consented to the jurisdiction of a United States Magistrate Judge; the case was transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 17). On January 8, 2018, the plaintiff filed his Motion to Reverse the Decision of the Commissioner

---

[2] The Appeals Council noted that there was "no evidence from a vocational expert regarding the impact of the claimant's non-exertional limitations on the ability to perform jobs remaining in the national economy." (Tr. 231). Therefore, as the Appeals Council concluded, "[t]he record lacks substantial evidence to support the conclusion that a significant number of jobs exist which the claimant can perform." (Tr. 231). The case was remanded for the ALJ to

> [o]btain updated evidence concerning the claimant's mental and/or physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.913). The additional evidence may include, if warranted and available, a consultative examination and medical source statements about the claimant can still do despite the impairments.

(Tr. 231).

[3] On the same day, the plaintiff filed a Motion for Leave to Proceed *In Forma Pauperis* (*see* Doc. No. 2), which the Court granted.

(Doc. No. 21), and brief in support (Doc. No. 21-2 ["Pl.'s Mem."]),[4] and on April 6, 2018, the defendant filed her Motion to Affirm (Doc. No. 29), and brief in support (Doc. No. 29-1 ["Def.'s Mem."]). On May 1, 2018, this case was reassigned to this Magistrate Judge. (Doc. No. 30).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) is *granted such that the matter is remanded for further proceedings consistent with this Ruling*, and the defendant's Motion to Affirm (Doc. No. 29) is *denied*.

II.     FACTUAL BACKGROUND

A.     HEARING TESTIMONY

On the date of his second hearing, the plaintiff was fifty years old and living with his mother. (Tr. 79). The plaintiff has lived with his mother since he moved back to Connecticut from Los Angeles in 2009. (Tr. 80). The plaintiff has an MBA from DePaul University in Chicago and worked as an accountant in Los Angeles before he stopped working in 2007.[5] (Tr. 81-82). The plaintiff testified that his last long-term employment ended in 2006 when he was laid off; he started having panic attacks and was "so stressed out it was ridiculous." (Tr. 97). However, it was not until January 2008 that the plaintiff "realized [he] had a problem[]" because he was "in denial before that." (Tr. 98). In 2010, the plaintiff was treated for cardiac heart failure (Tr. 99), after which he suffered from "severe depression[.]" (Tr. 100). At the time of the hearing, the plaintiff reported that he had been sober for the past year (Tr. 84), and that he attended Alcoholics Anonymous meetings three times a week. (Tr. 85). According to the plaintiff, he suffers from

---

[4] In addition to copies of case law, attached to the plaintiff's Motion is a Statement of Material Facts which the defendant moved to strike on February 13, 2018. (Doc. No. 23; *see* Doc. Nos. 24-25). On March 8, 2018, the Court granted the Motion to Strike (Doc. No. 27), and on March 28, 2018, the plaintiff filed a Joint Statement of Material Facts. (Doc. No. 28).

[5] The plaintiff worked for Warner Music from 1999-2006 and for Dick Clark Productions for a short time in 2007. (Tr. 368, 376).

panic attacks, which are "just as bad[]" now that he is sober, even with "the [fourteen] pills" he takes each day. (Tr. 86).

The plaintiff testified that he does aqua classes three times a week and walks his dog "about a block" to keep his "heart going." (Tr. 87, 89). According to the plaintiff, he is "bad" with hygiene. (Tr. 91). He makes simple meals and is not allowed to use the stove, and he gets "bored" or loses interest when doing chores. (Tr. 91; *see also* Tr. 103 (mows the lawn in "pieces and parts[]")). He drives to the gym and grocery store, but he always uses a GPS because "[s]ometimes" he forgets where he is going. (Tr. 92). According to the plaintiff, he is "horrific in groups . . . [; he is] afraid of them." (Tr. 94). He does not answer his phone; he tries "to avoid social interaction." (Tr. 106). The plaintiff described his writing as "so horrific[,]" "like, scribble[;]" he cannot complete tasks[;] he "screw[s] up with everything[,]" and his short-term memory is "shot." (Tr. 103-06).

Dr. John Nowicki, who is the plaintiff's mother's first cousin, testified that he has been the plaintiff's primary care physician since 2008. (Tr. 109-10). Dr. Nowicki testified that the plaintiff has marked depression that "worsened after his hospitalization in February 2010[]" and "became bipolar." (Tr. 111). According to Dr. Nowicki, the plaintiff has frequent panic attacks that affect his ability to function. (Tr. 111). As of result of his hospitalization in February 2010, during which he suffered from cerebral anoxia, he has suffered from a "decrease in his cognitive function[]," and his IQ decreased by 40 points. (Tr. 111-14, 116). Additionally, Dr. Nowicki opined that the plaintiff's psychiatric treatment "seems to be somewhat successful, but not fully successful[,]" as the plaintiff has "developed bipolar disorder" (Tr. 114), and he has difficulty concentrating and "following through." (Tr. 116). According to Dr. Nowicki, the

plaintiff has marked restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, and the plaintiff's mental impairment meets Listing 12.03. (Tr. 118-19).

The vocational expert testified that a person of the plaintiff's age, education, and work experience who is limited to the light exertional level of work could occasionally bend and balance, twist, climb, crawl, kneel, and squat; could sustain routine, simple, repetitive tasks not requiring teamwork or working closely with the public; could engage in occasional interaction with the public, supervisors, and coworkers; and could perform the following light, unskilled jobs: office helper with approximately 207,000 jobs in the national economy; hotel housekeeper with approximately 137,000 jobs in the national economy; and mail clerk with approximately 122,000 jobs in the national economy. (Tr. 121-23).

B.    MEDICAL HISTORY[6]

On August 4, 2008, the plaintiff was admitted at California Pacific Medical Center after presenting to the emergency room with reports of a seizure. (Tr. 755; *see* Tr. 755-57). He stated that he previously had a seizure in March, but attributed it to anxiety and did not seek medical attention. (Tr. 755). The plaintiff "actively denied any significant use of alcohol or any other drugs throughout the course of his hospital stay[,]" and his partner, who accompanied him, reported that the plaintiff was "clearly minimizing his alcohol use." (Tr. 755). Testing in the emergency room confirmed a blood alcohol level and the presence of cocaine. (Tr. 755). The plaintiff's seizure symptoms were diagnosed as "most consistent with alcohol withdrawal." (Tr. 756). He was also diagnosed with alcoholic hepatitis and hypertension. (Tr. 756). The plaintiff was treated for alcohol withdrawal, but despite ongoing symptoms, by August 8, he was

---

[6] As stated above, the plaintiff's alleged onset date of disability is January 15, 2008 (*see* Tr. 344); accordingly, although the Court has reviewed the entire transcript, the Court will address only the medical records as they relate to the plaintiff's alleged period of disability. The plaintiff's medical history is drawn largely from the parties' Joint Stipulation of Facts. (Doc. No. 28).

discharged upon request, as he was not considered "a candidate for hold" given that he was appropriately oriented. (Tr. 756). The plaintiff returned to the emergency room the next day for readmission; the attending doctor noted that when the plaintiff left the hospital the day prior, he "clearly went out and drank." (Tr. 758-59). He was discharged with a diagnosis of alcohol withdrawal, a prescription for Ativan, and a referral for inpatient detoxification. (Tr. 759).

Thereafter, the plaintiff was admitted for rehabilitation from September 10 to 24, 2008. (Tr. 451-56). He was discharged with the following diagnoses: alcohol dependence, anxiety not otherwise specified, and rule out panic disorder; he was prescribed medication for anxiety and hypertension. (Tr. 451-53). The plaintiff also had elevated liver function tests, seizures, sleep apnea, hypertension, and anemia. (Tr. 452). The plaintiff was directed to follow-up with a psychiatrist within two weeks. (Tr. 452).[7]

On July 6, 2009, the plaintiff was treated at St. Vincent's Medical Center after he "was found down at the Bridgeport Train Station." (Tr. 622, 1373-75; *see generally* Tr. 629-35 (normal x-rays, CT chest scan, CT head scan, CT abdominal scan)). After treatment of abrasions, the plaintiff was assessed as ready to be discharged "when he sobers up." (Tr. 1374).

On August 31, 2009, the plaintiff was admitted for residential treatment for chemical dependence relapse at Ocean Hills Recovery, where he was treated by Martin Pennington, Psy.D. (Tr. 470-73; *see* Tr. 463). Dr. Pennington, a psychologist, observed on a mental status examination that the plaintiff was of high intelligence with an intact memory, without thought disorder, and without delusions or hallucinations. (Tr. 470). The only diagnosis that Dr. Pennington noted was alcohol dependence. (Tr. 470).

---

[7] About eight months later, on May 7, 2009, the plaintiff was seen at an urgent care clinic after sustaining a puncture wound to his forearm from a metal fence. (Tr. 459-61, 1125-28).

The plaintiff met with Dr. Pennington on a weekly basis for the month of September, starting on September 2, 2009. (Tr. 474).[8]  The plaintiff reported that, at that time, he was "working on his C.P.A[,]"  and that he worked for Warner Brother's music "doing accounting and finance" when he lived in Los Angeles. (Tr. 474). According to the plaintiff, he underwent intensive outpatient treatment for alcohol dependence once before, for two weeks, following which he "stayed sober for a couple of months and then started binging." (Tr. 474).  A mental status examination was unremarkable, and the plaintiff was clean and appropriately dressed. (Tr. 474). He was cooperative; he had good eye contact and normal speech; his mood was happy; his memory was intact; his insight was good; his judgment was fair; and, his thought process was coherent. (Tr. 474).  Dr. Pennington noted that the plaintiff had above average intelligence, and good attention and concentration. (Tr. 474). The plaintiff's goal was to "stop his binge drinking and stop drinking completely so that he can truly live his life." (Tr. 474).  By September 28, 2009, he was looking for a job and planning to return to California. (Tr. 469). He was discharged on October 1, 2009, in good condition, but Dr. Pennington noted his concern that the plaintiff needed thirty more days of treatment and had not fully accepted his alcoholism. (Tr. 463).

From February 26 to March 6, 2010, the plaintiff was admitted to Western Medical Center in California. (*See* Tr. 477-571). The plaintiff presented with shortness of breath and heart palpitations; he was diagnosed with bilateral pneumonia (Tr. 479 ("septic pneumonia")), then with cardiomegaly and cardiogenic shock.  (Tr. 477).   He was found to have major arterial blockages that required stenting. (Tr. 481). The plaintiff reported a history of anxiety disorder, and was noted to be "very anxious[]" upon admission.  (Tr. 481).

---

[8] The record contains an identical note dated July 2, 2009, which, in context, appears to be a typo. (Tr. 465).

During his cardiology consult, Dr. Arthur Selvan noted that an echocardiogram "revealed an enlarged left ventricle with severe generalized hypokinesis and markedly reduced indices of systolic performance: Estimated ejection fraction approximately 18-20%." (Tr. 484-85). Dr. Selvan diagnosed "severe cardiomyopathy of unknown etiology with markedly diminished indices of left ventricular systolic performance . . . . Shock syndrome: probably cardiogenic; respiratory failure with bilateral infiltrates: probably congestive heart failure . . . ." (Tr. 485) (emphasis omitted). He assessed the plaintiff's prognosis as "[v]ery poor." (Tr. 485). On February 28, 2010, Dr. Selvan inserted a Swan-Ganz thermodilution catheter and arterial line, and while hospitalized, the plaintiff underwent a catheterization and the insertion of stents. (Tr. 492, 494; *see also* Tr. 496-97).

During his hospitalization, the plaintiff was very anxious, had chronic essential tremors, and was given medication for iron-deficiency due to anemia. (Tr. 477). In a psychiatric consultation subsequent to his cardiac surgery, the plaintiff reported that he had "always been a nervous, anxious guy," that he did not "drink that much anymore," and that he was "binge drinking but . . . was still able to work 60 hours a week." (Tr. 486). The plaintiff denied ever having a psychiatric diagnosis or seeing a psychiatrist or psychologist other than for alcohol dependence, and he noted that he has "always been very functional throughout his life despite the alcoholism." (Tr. 486-87). According to the plaintiff, he was "in between jobs secondary to the economy and frequent moving back and forth between the East Coast and different cities on the West Coast." (Tr. 488). The plaintiff reported that he was currently drinking a few glasses of wine once or twice a week (Tr. 486), although at other points during the admission, the plaintiff said that he was drinking vodka. (Tr. 481, 490). The plaintiff stated that he had a brief period of panic attacks driving or going over bridges, for which he took Xanax, but that "this resolved[,]"and although

the consulting psychiatrist advised the plaintiff that he could receive psychological follow-up after discharge, the plaintiff saw "no need for psychiatric follow[-]up." (Tr. 487-88).

The plaintiff subsequently returned to Connecticut and began treatment at Cardiac Specialists, P.C., primarily under the care of Dr. Steven Kunkes. (*See* Tr. 678-87, 943-45).[9] On March 30, 2010, the plaintiff reported to Dr. Kunkes that he "now feels well – no [chest pain]" and that epigastric discomfort, which he had experienced, was "now better." (Tr. 678).

On June 14, 2010, the plaintiff presented to the emergency room for complaints of palpitations and pulsing in his veins lasting one day. (Tr. 577-82, 699-700). The plaintiff denied chest pain, shortness of breath, or nausea, but reported some lightheadedness. (Tr. 577, 699). He smelled of alcohol and had a breath level reading of 0.34. (Tr. 577, 699). Emergency room personnel noted that the "[plaintiff] appears to be an alcoholic[.] Mother tends to be confrontive [sic] and [intrusive]." (Tr. 588). The plaintiff reported that he was not working "because he is grieving the deaths of [two] friends." (Tr. 588).

Upon examination, the cardiologist felt that there was no cardiac indication for an admission (Tr. 573, 578, 1291, 129); the plaintiff was admitted, however, for alcohol detoxification. (Tr. 572-74, 1290-93; *see* Tr. 589-608). He reported that he had been binge drinking since college "to 'self-medicate' for his high anxiety level, which he has suffered since childhood." (Tr. 572). He also reported a long history of major depression, decreased appetite, anhedonia, and substance abuse. (Tr. 572). The plaintiff was treated for alcohol withdrawal, given

---

[9] As the parties agree, although the name of the doctor in these visits is not stated, for purposes of this recitation, the visits at Cardiac Specialists will be regarded as having taken place with Dr. Kunkes. (*See* Tr. 678-87, 943-45; *see* Doc. No. 28 at 5, n.4).

Lexapro for depression, and was discharged three days later with instructions to see APRN Robert Krause for follow-up. (Tr. 573-74).[10]

The plaintiff was seen at Cardiac Specialists on June 21, 2010; the plaintiff's coronary artery disease was noted as "stable." (Tr. 684). The plaintiff's blood pressure was 80/60 sitting and 70/60 standing; medications were ordered and the plaintiff was instructed to "take salt." (Tr. 684). The following day, the plaintiff returned with complaints of esophageal discomfort and a feeling of "pulsations" in the veins of his arm. (Tr. 683). In a letter dated the same day, Dr. Kunkes informed Dr. Nowicki[11] that the plaintiff's "current problems" were anemia, abnormal liver tests "which may be due to alcohol, and an elevated creatinine that may be due to dehydration." (Tr. 751).

On August 4, 2010, the plaintiff presented to the emergency room for complaints of right shoulder pain after he "ran into a door frame by accident." (Tr. 640, 763, 1331; *see* Tr. 640-53, 763-68, 1131-36). He suffered a right shoulder fracture. (Tr. 642-44, 765-67).

The plaintiff was seen for an orthopedic consultation for the shoulder fracture by Dr. David J. Martin on August 5, 2010; the plaintiff reported that he was "in fairly good health otherwise." (Tr. 663-64; *see* Tr. 675). Dr. Martin recommended surgery pending cardiology clearance. (Tr. 664; *see* Tr. 665). In a Cardiac Specialists visit on August 10, 2010 for surgical clearance, the plaintiff smelled heavily of alcohol and had slurred speech. (Tr. 681). The plaintiff underwent the right shoulder surgical procedure on August 18, 2010. (Tr. 636-38, 674-76, 760-62, 1347, 1371-72; *see* Tr. 666-73).

---

[10] On January 10, 2011, APRN Krause completed an assessment of the plaintiff that is discussed in Section IV.C. *infra*.

[11] As discussed in Section II.A. *supra*, plaintiff has been treated by Dr. Nowicki since 2008. (*See* Tr. 938).

At his September 3, 2010 appointment with Cardiac Specialists, the plaintiff reported that he felt well. (Tr. 680). Two months later, on November 12, 2010, the plaintiff reported to Dr. Martin that he still had difficulty fully elevating his arm, but he was "trying to do a lot of things including playing football and raking leaves." (Tr. 669). Dr. Martin advised the plaintiff to be patient, work daily on stretching, and "[n]o football." (Tr. 669). On November 29, 2010, the plaintiff told Dr. Martin that he fell over the weekend and landed on his lower back and right elbow. (Tr. 670). Two weeks later, on December 13, 2010, the plaintiff reported that his back felt better, and there was no mention of his right elbow. (Tr. 672). The plaintiff reported, however, that he broke a rib while snowboarding a year ago and that recently, his rib pain was re-aggravated. (Tr. 672). He also reported increased shoulder pain. (Tr. 672). Dr. Martin observed that, on x-rays, the plaintiff's shoulder looked healed, but recommended a computed tomography scan of the shoulder to "make sure that we are not dealing with non-union." (Tr. 672). He recommended that the plaintiff restrict his activities. (Tr. 672). The plaintiff was seen on the same day at Cardiac Specialists, where he reported that he stopped drinking alcohol. (Tr. 678). On December 17, 2010, the plaintiff underwent imaging of his right shoulder which revealed "[r]ight pleural effusion" for which "further investigation [was] warranted." (Tr. 710, 732, 853).

When the plaintiff returned to Cardiac Specialists on January 17, 2011, he mentioned being active in an exercise program, and that he felt better and was less depressed. (Tr. 724). On February 9, 2011, the plaintiff was seen for a neurological consultation with Dr. Philip Barasch for complaints of memory difficulties, most of which were brought to his attention by his mother, who told him that he did not pay attention and did not remember tasks he needed to do. (Tr. 706). His mother reported that the plaintiff had increased anger at home and that he had "not been the same person that he was previously." (Tr. 706). She reported that he was also drinking alcohol

too much, but the plaintiff denied this and said he only drank once a week. (Tr. 706). According to his mother, the plaintiff was somewhat "disinhibited[,]" at times "delusional," and that he had not been telling her the "truth." (Tr. 706). On examination, the plaintiff had intact language function, attention span, recall and concentration, and during conversational speech, the plaintiff "appeared quite tangential." (Tr. 706). Dr. Barasch assessed the plaintiff as having "had a behavioral change," and it was unclear whether this represented a psychiatric disorder or "a possible neurological problem such as frontotemporal dementia given that he has not been working for at least the past five years for unclear reasons or alcohol abuse." (Tr. 707). Dr. Barasch performed an electroencephalography, which was normal. (Tr. 705). He recommended a neuropsychological examination. (Tr. 707).

Dr. Martin observed on February 15, 2011, that the plaintiff was doing better and had no pain. (Tr. 851). He advised the plaintiff to continue use of an Exogen stimulator and could resume a strengthening program including pulleys, but not to play football or "contact sports obviously." (Tr. 851).

On March 31, 2011, the plaintiff presented to the emergency room with complaints of ringing in the left ear for the past three weeks which became worse that night when he was drinking alcohol. (Tr. 769, 1342; *see* Tr. 769-72, 1342-45). The plaintiff thought that he may have been injured while "playing sports[.]" (Tr. 770). He denied significant alcohol intake or having a drinking problem, but his mother and brother reported that he had been very intoxicated each day for at least a week. (Tr. 770). The plaintiff's mother reported that the plaintiff told her to kill him and gave her a knife, and she demanded that he "be sent to detox because he is mentally imbalanced." (Tr. 770). The plaintiff did not want to go to detox, and when his mother continued to demand admission, the plaintiff became angry and "got up and went straight to the door and

left, no unsteady gait, clear intent, very aware of his action. He was calm and cooperative during his stay, was very clear in expressing his preferences. Mom was aggressive, somewhat belligerent and threatening." (Tr. 771). The plaintiff's mother was advised that a person who was alert and oriented could not be forced into detox, but she repeatedly stated that the plaintiff was unbalanced and mentally unwell and should not be allowed to make his own decisions. (Tr. 771).

On April 7, 2011, the plaintiff presented for a neuropsychological evaluation with Dr. Michelle Bobulinski. (Tr. 773-78).[12] Dr. Bobulinski assessed the plaintiff as having "[m]ild subcortical neurocognitive weaknesses, in the setting of a significant history of cardiovascular disease, psychological and emotional difficulties, and alcohol dependence." (Tr. 773). A review of the plaintiff's records indicated that he left his corporate finance or accounting job to travel, but then could not find a job for the next one or two years. (Tr. 773). The plaintiff reported that he was laid off. (Tr. 773). He also noted, "He and his family are concerned that some of his personality changes may have resulted or been exacerbated by his cardiac condition, as he reportedly was deprived of oxygen for two days when he had congestive heart failure and was treated for pneumonia instead." (Tr. 774). He admitted to using alcohol increasingly after he stopped working, and his family observed that his personality was significantly different and that he had been drinking alcohol in excess. (Tr. 774). He could go for a week or longer without using alcohol, but would then be triggered by something and have excessive use including periods of blacking out. (Tr. 774). The plaintiff reported that "[o]nce every two months, approximately, he experiences symptoms of vertigo[.]" (Tr. 774). Over the past year, the plaintiff had been independent in his daily living activities, however, he is "relatively isolated." (Tr. 774). The plaintiff was recovering from a shoulder injury, and hoped to resume

---

[12] See note 23 *infra*.

regular exercise. (Tr. 774). He was not aware of any obvious cognitive changes, but reported that his lifestyle changed so dramatically it was difficult for him to tell. (Tr. 774). He reported being increasingly depressed due to missing his friends and former lifestyle, and not having a job. (Tr. 774). The plaintiff stated that finding a job was his top priority, but he was "feeling some trepidation with respect to returning to work and question[ed] whether he [would] able to handle the same pace and lifestyle as before. Reportedly, he enjoyed his work lifestyle, which also included an intense 70+ hour work week, including socializing for business." (Tr. 774). The plaintiff reported a somewhat disturbed sleep routine, staying awake until four in the morning due to some depression and some anxious ruminations. (Tr. 774).

Dr. Bobulinski noted the plaintiff's tremor and that he had a mildly anxious and depressed mood. (Tr. 775). The plaintiff recalled events with no apparent difficulty, and he had no observable evidence of thought disorder or psychosis. (Tr. 775). Testing results showed overall mild subcortical cognitive weaknesses, and Dr. Bobulinski noted that, given the plaintiff's estimated premorbid intellectual functioning, the current results "may actually represent[] a more significant change or dampening of neurocognitive functioning." (Tr. 776). The plaintiff's self-reports of psychological functioning and personality showed a profile similar to individuals indicating somatic complaints and behavioral dysfunction. (Tr. 776). Assuming that physical origins of the plaintiff's reported neurological and gastrointestinal symptoms could be ruled out, the results suggested a potential somatoform disorder, although "alcohol/substance abuse also remains a significant area of concern," which further "increases risk to the patient's cognition and overall health and well-being, including vascular disease and potential progressive cognitive decline." (Tr. 776). The plaintiff admitted to getting drunk at least once a week, as well as taking drugs or sleeping pills not prescribed by a doctor. (Tr. 776-77). Dr. Bobulinski had several

recommendations, including an MRI of the plaintiff's brain, psychiatric evaluation, and psychotherapy, but Dr. Bobulinski also noted that the plaintiff's acting-out tendencies could result in treatment noncompliance. (Tr. 778).

The plaintiff returned to Dr. Barasch on April 19, 2011. (Tr. 780-81). He stated that he ceased drinking alcohol and had been applying for work. (Tr. 781). He reported an improved memory and no major behavioral issues. (Tr. 781). The plaintiff's mother, who was interviewed separately, said that the plaintiff was "constantly lying" and that he continued to drink. (Tr. 781). After reviewing Dr. Bobulinski's evaluation, Dr. Barasch ordered an MRI which was done on April 28, 2011; the results revealed mild cerebral atrophy. (Tr. 779, 782).

The plaintiff returned to Dr. Martin for his shoulder on April 27, 2011; he reported doing really well, with no pain. (Tr. 852). Dr. Martin recommended that the plaintiff return in a year and that he "can essentially do whatever he can tolerate." (Tr. 852).

The plaintiff's visits with Dr. Nowicki throughout 2011 focused on alcohol use (Tr. 935-37), and in late May, the plaintiff mentioned that he was exercising four times a week. (Tr. 937).

On June 26, 2011, the plaintiff began treatment at the Pride Institute for "alcohol use, and depression[]"(Tr. 787); his admitting diagnosis was alcohol dependence. (Tr. 803-04). He was admitted for residential treatment until discharge on July 20, 2011. (Tr. 787-804). He reported that he had been heavily binging on alcohol three times a week for the past six months. (Tr. 808; *see* Tr. 794, 800). On July 2 and 6, his mood and affect were "neutral to positive" (Tr. 790-91), and, in his mental health consultation on July 4, 2011, the plaintiff's "[p]resenting [p]roblem" was that he "can't stop drinking." (Tr. 792). On July 6, 2011, it was noted that his tremor was improving as was his insight and judgment. (Tr. 790; *see also* Tr. 806 (July 13, 2011, plaintiff reported tremor "is better")). He also admitted to occasional cocaine use. (Tr. 792). When asked

if he had mental health concerns, the plaintiff stated that he had regrets about a former relationship. (Tr. 792). His discharge diagnosis was alcohol dependence (Tr. 798; *see also* Tr. 793), although, in the discharge summary, the plaintiff reported "symptoms of depression and panic attacks." (Tr. 794).

On July 29, 2011, Dr. Kunkes informed Dr. Nowicki that the plaintiff had complaints of fatigue and was taking three different medications of the same type, which were adjusted. (Tr. 942). The plaintiff returned to Cardiac Specialists on December 8, 2011, at which time he reported that he was active, but not exercising. (Tr. 809). He complained of dizziness with vertigo and vomiting. (Tr. 809). His blood pressure medications were adjusted. (Tr. 809). His coronary artery disease was stable. (Tr. 809). On December 11, 2011, Dr. Kunkes wrote a letter to Dr. Nowicki to inform him that the plaintiff "has been adjusting his own medications" and consequently had relatively high blood pressure and elevated cholesterol, and his medications were being adjusted. (Tr. 940).

On December 16, 2011, the plaintiff underwent a consultative evaluation with Bina Roginsky, Psy.D. (Tr. 814-17). [13] The plaintiff's mother reported that he had major changes in his cognition after his cardiac event, which she described as resulting in loss of oxygen to the brain. (Tr. 814). The plaintiff and his mother reported that he had not had any alcohol since he attended rehabilitation sometime in the last year. (Tr. 814). Dr. Roginsky observed that the plaintiff was detached and passive, many times was unable to provide details and frequently gave contradictory and illogical answers. (Tr. 815). The plaintiff was "difficult to understand, and he had trouble with speaking only English." (Tr. 815). He often repeated words, took long pauses to

---

[13] *See* note 23 *infra.*

find words, and was not able to express himself with appropriate detail. (Tr. 815). He did not respond appropriately to many questions and had minimal spontaneous speech. (Tr. 815).

Dr. Roginsky administered cognitive testing, which she felt was a valid measure of the plaintiff's functioning, showing a full scale IQ of 47. (Tr. 815). She noted that a thorough personality assessment could not be conducted due to the plaintiff's difficulty answering questions, but in separate interviews with the plaintiff and his mother, she learned that the plaintiff had difficulty performing the most basic tasks. (Tr. 816). Attempts to redirect him or offer guidance would result in arguments, slamming doors, destroying property, or yelling; he had a limited social network and was very depressed and anxious. (Tr. 816). The plaintiff's mother reported that he threatened to hurt himself; the plaintiff denied this but also reported that he cut himself in the past without specifying when or how often. (Tr. 817). The plaintiff reported that he had "attempted to gain employment, and ha[d] gone on several job interviews[,]" but received no offers. (Tr. 817). He reported that he was no longer able to drive as he would become confused even in familiar places. (Tr. 817). Dr. Roginsky opined that the plaintiff's "overall cognitive functioning was in the Extremely Low range, . . . [and his] Index Scores were all in the same range, . . . showing minimal cognitive abilities and comprehension." (Tr. 817). She noted that the plaintiff "appeared to put forth effort at the onset of every task, and maintained his effort on all items administered. However, confusion, frustration, and giving up quickly greatly decreased his scores." (Tr. 817). Dr. Roginsky assessed the plaintiff as having dementia not otherwise specified and alcohol dependence by history. (Tr. 817).

From January 11 to February 23, 2012, the plaintiff underwent an intensive outpatient program at Bridgeport Hospital on "a self referral for behavioral health and early recovery care." (Tr. 855; *see* Tr. 855-916; *see also* Tr. 918-34 (toxicology reports)). The plaintiff reported that

he had been in sober housing rehabilitation in Minnesota for five months, and that he was a binge drinker with "last steady use [on] 12/31/11." (Tr. 855). The Master Treatment Plan included diagnoses of major depression disorder, recurrent psychotic features and alcohol dependence. (Tr. 868-69). Upon discharge, the plaintiff was referred to Fairfield Counseling Services. (Tr. 855).

The plaintiff continued to be treated at Cardiac Specialists, for management of his blood pressure, cholesterol, and medication for his coronary artery disease. (Tr. 1009-21). On March 28, 2012, he reported that he was exercising forty-five minutes every day. (Tr. 1012). He reported no shortness of breath with physical activity in aqua fitness, but that he did have shortness of breath with stair climbing or bending to tie his shoes. (Tr. 1012).

On March 7, 2012, the plaintiff began sessions at Fairfield Counseling Services. (Tr. 955-56, 982). The plaintiff wanted to "'deal with' his depression." (Tr. 982). He also wanted to come off medications, as he felt that he was "overmedicated." (Tr. 959). He reported that he was sober for two months, and that his longest period of abstinence was three months. (Tr. 960). The plaintiff began attending counseling and medication management sessions for diagnoses of bipolar disorder and alcohol abuse. (Tr. 951-65, 970-82, 985-88). The stated goal of treatment was to engage in life, get a job, socialize, and maintain sobriety. (Tr. 957, 966, 968). In July 2012, the plaintiff reported that he maintained sobriety since January and had been going on interviews and engaged in several social functions with family and attended a class reunion. (Tr. 966).

On August 8, 2012, the plaintiff was seen at the emergency room after he "hit [his] head against [a] dog's mouth" while he was walking a dog as "he usually does as a volunteer [at] the [H]umane [S]ociety." (Tr. 1129-33).

On November 2, 2012, Dr. Kunkes wrote a letter to the plaintiff's attorney stating that the plaintiff had "a complex medical history including hypertension, congestive heart failure, and

valvular heart disease." (Tr. 983). Dr. Kunkes wrote that, since his cardiac surgery in May 2010, the plaintiff "has been plagued with problems including weight gain, abnormal live function tests, inability to control cholesterol, and shortness of breath with exertion." (Tr. 983). The plaintiff also complained of anxiety, depression, inability to concentrate, and inability to finish tasks. (Tr. 983). Dr. Kunkes noted that the plaintiff "has been treated for pneumonia as well[,] . . . there is a question of prolonged hypoxia at the time of his myocardiac infarction in 2010[,]" and that the plaintiff frequently naps. (Tr. 983). He also noted that the plaintiff "attempted to change his lifestyle to a healthier one and has succeeded for the most part, but has persistent medical problems that do not seem to be responding optimally to therapy." (Tr. 983).

On November 13, 2012, Dr. Nowicki authored a letter to the plaintiff's attorney stating that the plaintiff had been his patient since September 2008 and that he has depression and acute anxiety, tires "very easily," sleeps three to four times a day, cannot concentrate, and has trouble following through with projects. (Tr. 984).

At a session at Fairfield Counseling on November 15, 2012, the plaintiff reported that he had been avoiding social interactions due to dissatisfaction with his weight. (Tr. 988). He was feeling flat and unmotivated, and he was diagnosed with bipolar disorder. (Tr. 988).

At Cardiac Specialists on January 8, 2013, the plaintiff reported that he wanted to lose weight, and had stopped all his psychiatric medications, but felt "mostly" okay. (Tr. 1033). At Fairfield Counseling approximately a week later, the plaintiff reported that Lexapro helped with depression but greatly reduced his motivation, which affected him socially and affected his activity level. (Tr. 1047). He reported that he reduced the dosage himself and felt less empty and more positive. (Tr. 1047).

On January 23, 2013, on referral from Dr. Joao Nascimento, the plaintiff was seen by Dr. Erika A. Strohmayer at Endocrine Associates, LLC, for a consultation on a history of low testosterone level of unknown etiology. (Tr. 1072). He complained of low energy, weight gain, muscle weakness, disrupted sleep, some decreased vision, back, pain, depression, and fatigue. (Tr. 1072-73). The plaintiff reported that he used alcohol once or twice a month and that he did not exercise. (Tr. 1073).

On March 4, 2013, Debra Tomaselli, MFT and James Alexander, MD of Fairfield Counseling cosigned a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on behalf of the plaintiff in which they indicated that the plaintiff had been in treatment from March 2012 to February 2013, and that, as of July 6, 2013, the plaintiff had marked limitations in most areas of carrying out instructions as well in activities of daily living and social functioning. (Tr. 1048-49). They noted that they were "unable" to complete the form prompts on ability to interact with supervisors, coworkers, and the public. (Tr. 1049). Regarding alcohol or substance abuse, they wrote "none reported by [c]lient." (Tr. 1050). They did not identify any medical or clinical findings in support of the responses. (Tr. 1048-50).

The plaintiff returned to Dr. Strohmayer on March 6, 2013 with complaints of decreased energy and depression; he reported going to the gym "but not regularly." (Tr. 1069). She assessed the plaintiff with borderline diabetes mellitus, metabolic syndrome, and mild hypogonadism, and she recommended weight loss. (Tr. 1071).

The plaintiff was seen from January to April 2013, at Cardiac Specialists for medication adjustments, and weight management. (Tr. 1034-38). On April 17, 2013, the plaintiff saw Dr. Arthur S. Turetsky for a pulmonary consultation on obstructive sleep apnea. (Tr. 1114-20). The plaintiff had gained sixty pounds since his sleep study, and he reported that he swam three times

a week and used a treadmill twice a week. (Tr. 1114-15). He reported that he had a physical disability from dyspnea and muscle weakness. (Tr. 1115). Dr. Turetsky opined that the plaintiff has chronic obstructive pulmonary disease for which he prescribed Singulair. (Tr. 1116). On June 13, 2013, the plaintiff reported to Dr. Turetsky that he was using a continuous positive airway pressure ["CPAP"] machine and was feeling much better. (Tr. 1111-13). Visits through October 21, 2013 showed no notable developments. (Tr. 1104-10).

In a treatment plan from Fairfield Counseling, dated April 16, 2013, it is noted that the plaintiff had been consistent with therapy, although he was not always compliant with medication management. (Tr. 1040-42). He still experienced social isolation and sometimes struggled with self-esteem, but while he was sober, he had good relationships, an easy going attitude, was a better listener, and had a willingness and readiness to face challenges. (Tr. 1040). He was swimming three times a week, working out at the gym twice a week, and walking a dog three times daily. (Tr. 1040). On May 16, 2013, the plaintiff's goals were identified as sobriety and managing symptoms of bipolar disorder. (Tr. 1043-44). On May 28, 2013, the plaintiff reported that he was become more aggressive verbally with his mother and more depressed. (Tr. 1045). The plaintiff's sobriety was questioned because he presented with slurred and delayed speech. (Tr. 1045).

The plaintiff returned to Endocrine Associates on April 24, June 25, August 15, October 31, and December 12, 2013 with continued complaints of fatigue. (Tr. 1052-68, 1095-98). On June 25, 2013, his weight was 267 pounds, and it was noted that the plaintiff's testosterone was "likely on low side due to obesity, [which the doctor] would not treat due to sleep apnea[]"; he also had vitamin D deficiency and hypothyroidism. (Tr. 1062-65). On October 31, 2013, the plaintiff mentioned that his energy was still low; he was walking the dog but had no energy for the gym and went only twice a week. (Tr. 1052).

On January 27, 2014, the plaintiff presented to the Ahlbin Centers for Rehabilitation Medicine for a physical therapy evaluation for complaints of low back pain causing difficulty with activities like sitting, driving, lifting, and resuming his exercise routine. (Tr. 1146-53, 1167-82). The plaintiff reported that he had been working out and trying to lose weight, but, over the past few months, his chronic lower back pain and right shoulder pain had increased. (Tr. 1147, 1170). The plaintiff attended physical therapy sessions through March 17, 2014. (Tr. 1154-1163, 1167-1242). By February 6, he reported that "he did some snowblower work" (Tr. 1157, 1190), and the next day, he reported that he would be going to an aqua class and to lift weights at the gym. (Tr. 1197). On February 20, he mentioned that he was able to sit and drive for longer, but not able to lift yet. (Tr. 1207). He had "been going to aqua zumba class." (Tr. 1207). On February 26, the plaintiff mentioned that he had not been able to go to the gym as much because of school work. (Tr. 1214).

On March 18, 2014, the plaintiff was treated at the emergency room for alcohol withdrawal and detoxification. (Tr. 1307-30, 1366-70). The plaintiff reported binge drinking every two weeks (Tr. 1308, 1311) and also reported drinking one to three beverages daily. (Tr. 1327). The plaintiff later described being sober for over a year until a month ago when he started drinking mostly on weekends, and then, two days prior to his emergency room treatment, he drank half a liter of vodka. (Tr. 1329, 1363). The plaintiff had observable tremors, but no focal neurological deficits. (Tr. 1327). He was admitted for alcohol withdrawal until March 22, 2014 (Tr. 1362-65), and he was referred for inpatient rehabilitation, but the plaintiff refused and "opted for outpatient rehab while finishing school." (Tr. 1364).

On September 10, 2014, the plaintiff saw Dr. Strohmayer for a testosterone injection. (Tr. 1090-93). He returned for another injection on October 1, 2014, but after reviewing laboratory results, Dr. Strohmayer referred the plaintiff for a urology consultation. (Tr. 1086-89).

In October 2014, the plaintiff began sessions at Fairfield County Health & Wellness with psychiatrist Dr. Carine Jean for depression and anxiety. (Tr. 1377-91). Initial sessions focused on the plaintiff's poor performance in his CPA classes due to what he described as poor memory resulting from his loss of oxygen to his brain two years earlier. (Tr. 1384, 1386). The plaintiff was seen again by Dr. Jean on November 5, 2014 (Tr. 1384-85); he reported poor concentration and confusion and that he "feels dead at times." (Tr. 1384). Dr. Jean's diagnoses were bipolar disorder (unspecified); panic disorder with agoraphobia; generalized anxiety disorder; and alcohol dependence. (Tr. 1384).

A month later, on December 4, 2014, Dr. Jean noted that the plaintiff "has been increasingly confused and forgetful and has been lost going to familiar places." (Tr. 1386). The plaintiff continued to report being distracted in school and not doing well as a result. (Tr. 1386). He reported difficulty processing information and said that he understands things in the moment but forgets them quickly; he was "distressed" by his symptoms. (Tr. 1386). Dr. Jean noted that the plaintiff "is feeling moderately depressed. There is no evidence [of] hypomania or psychosis. Daytime sedation, forgetfulness and decrease [in] executive function are concerning." (Tr. 1386). Dr. Jean adjusted his medication and referred him for a neuropsychological assessment. (Tr. 1387).

The plaintiff returned to Dr. Turetsky on January 26, 2015; he reporting that he ran out of Singulair and that he was not using his CPAP machine. (Tr. 1101-03).

On February 5, 2015, the plaintiff underwent a neuropsychological examination with psychologist Dr. Timothy Belliveau. (Tr. 1138-43).[14] The plaintiff related that, about five years earlier, he underwent cardiac surgery and believed he experienced a lack of oxygen at that time, and then, when he was undergoing cardiac rehabilitation, he "began to get very severely depressed." (Tr. 1139). The plaintiff stated that he had not worked in about five years, had difficulty with concentration and memory, had fatigue and slept a lot. (Tr. 1139). According to the plaintiff, he "takes wine occasionally, . . . in moderation[,]" he has had a slight hand tremor since he was five years old, and he has had a history of panic attacks since 2005. (Tr. 1140).

During the evaluation, Dr. Belliveau observed that the plaintiff had "no difficulty maintaining alertness[,]" his speech was normal, and his thought processes were coherent and goal directed. (Tr. 1140-41). He reported that his recent moods were "flat," but somewhat better on medication. (Tr. 1141). His affect appeared anxious and slightly restricted, but otherwise appropriate. (Tr. 1141). Testing showed a full scale IQ of 98, and he had average attention and concentration abilities. (Tr. 1141). Dr. Belliveau summarized that the plaintiff had average range intellectual functioning. (Tr. 1142). There was no indication of a clinically significant memory impairment. (Tr. 1142). The plaintiff had "cognitive inefficiency, characterized by slowness of processing on tasks that require efficient thinking and/or efficient visuomotor integration." (Tr. 1142). The plaintiff also had some motor deficits that could be related to his history of hand tremors. (Tr. 1142). Dr. Belliveau assessed that the plaintiff had cognitive inefficiency that is often associated with mood disorder, but the absence of memory impairment, while not definitive, weighed against the presence of an anoxic brain injury. (Tr. 1142).

---

[14] *See also* Section IV.C. *infra*.

The plaintiff returned to Dr. Jean on March 13, 2015 with complaints of worsening depression, concentration, and energy level, and he stated that his short term memory was "gone." (Tr. 1388). He reported that he lacked interest in any activities and had sedation from his medications, increased appetite, ongoing problems with sleep, anger and irritability, social isolation, racing thoughts, and mood swings. (Tr. 1388). He slept during the day and preferred to stay up at night to talk to his friends in Los Angeles. (Tr. 1388). The plaintiff reported that he had not been productive, was not looking for a job, was taking a semester off from school, was waiting for his disability hearing, and was volunteering once a week at the Humane Society, but was "getting frustrated because he [was not] doing anything." (Tr. 1388). However, he stated that when he pushed himself he was able to do things. (Tr. 1388). The plaintiff said that he was drinking one alcoholic beverage a month. (Tr. 1388). Dr. Jean opined that the plaintiff's depression and anxiety were getting better, and she advised him to "[c]onsider ECT [Electro-Convulsive Therapy] and IOP [intensive outpatient treatment]." (Tr. 1388). On March 26, 2015, the plaintiff indicated that his mood was better and that he was going to the gym daily. (Tr. 1389). He had a job interview for a Director of Finance position at Disney in California. (Tr. 1389).

The plaintiff returned to Dr. Strohmayer on April 8, 2015; the plaintiff reported a recent diagnosis of prostate cancer which would preclude testosterone replacement. (Tr. 1078-81). He stated that he was not motivated and that he was "going to the gym but not working out as hard." (Tr. 1078).

On April 27, 2015, the plaintiff told Dr. Jean that he was feeling depressed because he was not working and did not have a social life. (Tr. 1390). He was going to the gym three to four times a week and meeting people there, and he planned to walk his dog three times a day. (Tr. 1390). The plaintiff said that he had not been sad and had fair energy. (Tr. 1390). He last drank alcohol

two weeks ago and drank two mixed drinks twice a month. (Tr. 1390). He did not have panic attacks in the last month, and he "tolerate[d] his medications but hasn't been very compliant." (Tr. 1390).

A month later, on May 27, 2015, the plaintiff reported feeling much better because he was keeping himself busy with going to the gym three times a week, attending Alcoholics Anonymous meetings four times a week, and doing yard work. (Tr. 1391). He was exercising, walked his dog daily and went to swimming classes twice a week. (Tr. 1391). The plaintiff's mother was very concerned because his memory continued to decline. (Tr. 1391). He played Scrabble on the Internet with friends and cooked at times. (Tr. 1391). Dr. Jean opined that the plaintiff's "impaired cognitive function and periods of confusion interfere with his ability to function in a work place" and advised the plaintiff to write down information instead of committing it to memory. (Tr. 1391). On June 22, 2015, Dr. Jean wrote a letter stating that the plaintiff had diagnoses of bipolar disorder, unspecified generalized anxiety disorder, and panic disorder with agoraphobia. (Tr. 1376).

C.     STATE AGENCY ASSESSMENTS

On May 9, 2011, State agency medical consultant Dr. Carol R. Honeychurch assessed that the plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours, and sit for six hours in an eight-hour workday. (Tr. 143-44). He could occasionally perform all postural activities except he could never climb ladders, ropes, or scaffolds. (Tr. 143-44). The plaintiff needed to avoid concentrated exposure to extreme cold and even moderate exposure to hazards, but he had no manipulative, communicative, or other environmental limitations. (Tr. 144).

On May 12, 2011, State agency psychological consultant Dr. L. Cattanach assessed that the plaintiff could maintain attention for two hours at a time and persist at simple tasks over an eight-hour day and forty-hour workweek with normal supervision. (Tr. 145-46). The plaintiff had no limitations in social interaction or adaptation. (Tr. 145-46).

On January 3, 2012, State agency psychological consultant Dr. Robert Decarli assessed that the plaintiff was capable of simple work and concurred with Dr. Cattanach's prior assessment. (Tr. 181-82, 200-01). Dr. Decarli observed that the plaintiff's consultative evaluation and IQ score were not consistent with all the other data. (Tr. 181, 200).

The same day, State agency medical consultant Dr. Maria Lorenzo assessed that the plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for six hours, and sit for six hours in an eight-hour workday. (Tr. 179-80, 198-99). Dr. Lorenzo assessed that the plaintiff had no postural, manipulative, communicative, or environmental limitations. (Tr. 180). Dr. Lorenzo noted that Dr. Honeychurch previously assessed a light RFC, but that the evidence overall showed improved cardiac function. (Tr. 180).

On May 10, 2012, State agency psychiatric consultant Dr. Aroon Suansilppongse assessed that, in the absence of drug addiction and alcoholism, the plaintiff would not have a severe mental impairment. (Tr. 819-42).

On May 14, 2012, State agency medical consultant Dr. Joyce Goldsmith completed a Physical Residual Functional Capacity Assessment of the plaintiff in which she opined that the plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours, and sit for six hours in an eight-hour workday. (Tr. 844; *see* Tr. 843-49). He could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs and balance; and, frequently perform stooping, kneeling, crouching, and crawling. (Tr. 846). He had no

manipulative, visual, or communicative limitations (Tr. 846), and he needed to avoid concentrated exposure to extreme cold, limit himself to moderate exposure to hazards, and otherwise had no environmental limitations. (Tr. 847). Similarly, on the same date, Stephen Abruzzo completed a Case Analysis of the plaintiff in connection with his application for benefits in which he concluded that the plaintiff has the physical capacity for a "[l]ight RFC[,]" and without drug abuse and addiction, his psychiatric impairment is "non-severe." (Tr. 850).

III.     STANDARD OF REVIEW

        The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the

reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

IV.  DISCUSSION

A.  THE ALJ'S DECISION[15]

Following the five step evaluation process,[16] the ALJ found that the plaintiff's date last insured under the Social Security Act was December 31, 2012 (Tr. 15) and that he has not engaged in substantial gainful activity from that date back through the January 15, 2008 onset date. (Tr. 15, citing 20 C.F.R. §§ 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*). The ALJ concluded that the plaintiff has the following severe combination of impairments: alcohol dependence, cardiomyopathy, coronary artery disease, mild cerebral atrophy, depression, bipolar disorder, and anxiety disorder. (Tr. 15-16, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). He next found that

---

[15] In his decision, the ALJ acknowledged that the Appeals Council remanded his initial decision on grounds that "vocational expert testimony was required to gauge the effect of the claimant's nonexertional limitations on his ability to perform jobs remaining in the national economy." (Tr. 12; *see* note 2 *supra*).

[16] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

the plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-18, citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The ALJ concluded, based on all of the plaintiff's impairments, "including substance abuse disorders, [that] the claimant has the residual functional capacity ["RFC"] to perform light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) "except he can occasionally bend, twist, squat, kneel, crawl, climb, and balance; is capable of sustaining routine, simple, repetitive tasks that do not require teamwork or working closely with the public; and can only have occasional interaction with the public, supervisors and co-workers." (Tr. 18-19).

The ALJ then concluded that if the plaintiff stopped the substance abuse, the plaintiff would continue to have a severe impairment or combination or impairments, but would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20-23, citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). Additionally, the ALJ found that, if the plaintiff stopped the substance abuse, he would have the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he "can occasionally bend, twist, squat, kneel, crouch, crawl, and balance; can sustain routine, simple, repetitive tasks that do not require teamwork or working closely with the public; and can occasionally interact with the general public, supervisors, and co-workers." (Tr. 23-32). The ALJ determined that, if the plaintiff stopped abusing alcohol, he would continue to be unable to perform past relevant work, but there would be a significant number of jobs in the national economy that he could perform. (Tr. 33-34, citing 20 C.F.R. §§ 404.1565, 416.965, 404.1560(c), 404.1566, 416.960(c) and 416.966). Accordingly, the ALJ held that the substance use disorder was a contributing factor material to the determination of disability because the plaintiff would not

be disabled if he stopped the substance abuse; because the substance use disorder was a contributing factor material to the determination of disability, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act from the alleged onset date through the date of his decision. (Tr. 35, citing 20 C.F.R. §§ 404.1520(g), 404.1535, 416.920(g) and 416.935).

B.    THE PLAINTIFF'S CLAIMS

The plaintiff contends that the ALJ failed to develop the administrative record as there is no medical source statement, and "none of the contemporaneous medical records from any of [the plaintiff's] treating physicians . . . address his actual functional limitations, and none address what he can and cannot do on a function-by-function basis." (Pl.'s Mem. at 1-11). The plaintiff also argues that the treating physician rule was not followed (Pl.'s Mem. at 11-18); the ALJ's alcohol abuse analysis is deficient (Pl.'s Mem. at 18-21); the ALJ's vocational findings are flawed (Pl.'s Mem. at 21-29); and the ALJ's combination of impairments evaluation was insufficient (Pl.'s Mem. at 29-33).

The defendant argues that substantial evidence supports the ALJ's RFC finding that, absent alcohol abuse, the plaintiff would be able to perform a range of light work involving simple tasks that did not require teamwork or working with the public, and only involved occasional interaction with others (Def.'s Mem. at 6-8); the evidence was adequate for the ALJ to reach his decision (Def.'s Mem.at 8-13); the ALJ reasonably weighed the opinion evidence (Def.'s Mem. at 13-18); the ALJ properly considered the plaintiff's alcohol use (Def.'s Mem. at 18-21); evidence probative of the plaintiff's functioning was reasonably considered (Def.'s Mem. at 21-24); and the ALJ reasonably relied on the vocational expert's testimony (Def.'s Mem. at 24-29).

C.    RFC ASSESSMENT AND CONSIDERATION OF TREATING PHYSICIANS'
      OPINIONS

As stated above, the ALJ concluded that the plaintiff retained the RFC to perform light work but with the limitations of "occasionally" bending, twisting, squatting, kneeling, crawling climbing, and balancing; and he was "capable of sustaining routine, simple, repetitive tasks that do not require teamwork or working closely with the public; and [could] only have occasional interaction with the public, supervisors and co-workers." (Tr. 18-19, 23-32). The ALJ found that these limitations existed both when the plaintiff was abusing alcohol, and when he was not. (Tr. 20).

The plaintiff argues that the ALJ failed to develop the record in that "none of the contemporaneous records from any of Mr. Wallace's treating physicians in any meaningful way address his actual functional limitations, and none address what he can and cannot do on a function-by-function basis."  (Pl.'s Mem. at 6).  Accordingly, the plaintiff contends that a remand is warranted.  (Pl.'s Mem. at 7).

The plaintiff bears the burden of demonstrating that his functional limitations preclude any substantial gainful work.  *See* 42 U.S.C. §§ 423(d)(5)(A), 1382(a)(3)(H)(i); 20 C.F.R. §§ 404.1512(c), 416.912(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled. You must provide evidence, without redaction showing how your impairment(s) affects your functioning during the time you say you are disabled . . . ."); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."); Social Security Ruling ["SSR"] 96-4p, 1996 WL 37187 at *2 (S.S.A. July 2, 1996).

As discussed at length above, and as the ALJ appropriately considered, the plaintiff's activities include going to the gym regularly, partaking in aqua classes, walking his dog, and volunteering with the Humane Society. (*See* Tr. 92, 1040, 1069, 1052, 1078, 1129-33, 1157, 1190, 1197, 1214, 1388-91). Additionally, the plaintiff returned to school (Tr. 1214, 1354 (outpatient rehab for substance abuse while attending school)), and, although he reported some difficulties with his classwork and his ability to focus, he continued to take classes and apply for work. (*See* Tr. 1386 (December 4, 2014, reported being distracted in school and not doing well as a result); Tr. 1388-89 (reported taking the semester off; had interview at Director of Finance at Disney in California)). Thus, this record is notable for the plaintiff's level of daily activities, and the ALJ appropriately considered these activities in his decision.[17] The ALJ's responsibility to review the record, however, does not end there.

In this case, the voluminous administrative transcript includes over seven years of detailed medical records from which the ALJ could base his conclusion. "[T]he court must assess the quality and scope of the opinions, not merely the quantity, in order to determine whether the record is sufficiently complete." *Moreau v. Berryhill*, No. 3:17-CV-00396 (JCH), 2018 WL 1316197, at *8 (D. Conn. Mar. 14, 2018) (citing *Sanchez v. Colvin*, No 13 Civ 6303(PAE), 2015 WL 736102,

---

[17] The plaintiff also contends that the ALJ's combination of impairments evaluation was insufficient as "[a] proper consideration of Mr. Wallace's obesity by its nature requires a combination of impairments analysis[.]" (Pl.'s Mem. at 29-33). The plaintiff asserts that the ALJ "gives every indication of ignoring" the plaintiff's morbid obesity. (Pl.'s Mem. at 32). However, the ALJ did address the plaintiff's obesity in his decision, concluding that his obesity was a "medically determinable impairment[,]" but that "the evidence shows that the claimant regularly goes to the gym, works out for 45 minutes, and engaged in exertional activity such as yard work[.]" (Tr. 16). Thus, the claimant's "excessive body weight appears to no more than minimally impair his ability to function." (Tr. 16). This conclusion is supported by the evidence in the record. (*See* Tr. 92, 1040, 1069, 1052, 1078, 1129-33, 1157, 1190, 1197, 1214, 1388-91). Additionally, although the plaintiff argues that his obesity may cause or contribute to his depression (Pl.'s Mem. at 32), he offers no support in the record for this connection; in fact, the plaintiff repeatedly reported an improvement in his mood when going to the gym regularly. (*See*, *e.g.*, Tr. 1389 (his mood was better and he was going to the gym daily), 1390 (reported that he has not been sad and has had fair energy when going to the gym three to four times a week)).

at *6-7 (2d Cir. Feb. 20, 2015)). This admonition is particularly important given the Appeals Council's directive on remand.

When the Appeals Council remanded this case in March 2014, it held that "[t]he record lack[ed] substantial evidence to support the conclusion that a significant number of jobs exist which the claimant can perform." (Tr. 231). Upon remand, the ALJ was to "[o]btain updated evidence concerning the claimant's mental and/or physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.913)." (Tr. 231). The Appeals Council emphasized that "[t]he additional evidence may include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite the impairments." (Tr. 231). Bearing this in mind, the Court considers the ALJ's review of the underlying records as articulated in his decision. (Tr. 231).

In his decision, the ALJ repeatedly noted the absence of functional assessments by the plaintiff's treating providers and assigned the greatest weight to the functional assessment provided by an APRN who has no underlying treatment records. As the ALJ acknowledges in his decision, the treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]); (*see* Tr. 26, 29-30). The ALJ's treatment of the opinions in this record contravenes this rule.

In his decision, the ALJ refers to APRN Robert Ware as the author of a January 11, 2011 assessment. (Tr. 29). Both counsel indicate that this record was authored by APRN Robert Krause

(Tr. 701-04), to whom the plaintiff was referred following his hospitalization for detox in June 2010. (*See* Tr. 573-74; Doc. No. 28 at 6-8).[18] In his decision, the ALJ emphasizes that this APRN saw the plaintiff every two months since June 2010, and that, since treatment began, the plaintiff demonstrated significant improvement. (Tr. 701). APRN Krause identified the plaintiff's diagnoses as alcohol dependence and alcohol induced mood disorder. (Tr. 701). According to APRN Krause, the plaintiff's substance abuse was in early remission as the plaintiff had abstained from alcohol for two months, and he had significantly improved in that period. (Tr. 701). APRN Krause indicated that the plaintiff had "no" to "slight" problems in activities of daily living, "no" problems with social interactions, and, except for a "slight" to "obvious" problem performing work activity on a sustained basis, "no" problems in task performance. (Tr. 702-03). He opined that the plaintiff had good judgment and insight when sober, but when "using" he was "dangerous[.]" (Tr. 702). He noted that "[t]oo much stress/frustration could *easily* lead to relaps[e.]" (Tr. 702) (emphasis in original). As to social interactions, there are "no obvious issues if sober[,]" and as to task performance, APRN Krause opined that the "patient appear[ed] as though [he] can complete minimal work related tasks but not the sort of work he used to do[.]" (Tr. 703). According to APRN Krause, although the plaintiff can handle his own benefits, Krause's "concern is that he would use [it on alcohol]. [Money] would be a trigger." (Tr. 704).

The ALJ selectively chose to assign "great weight" to this opinion. The opinion, however, is authored by an APRN, and, as the ALJ acknowledged, APRNs are not "treating sources[.]" *Selian*, 708 F.3d at 417; SSR 06-3p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006). As explained in SSR 06-3p, opinions from APRNs, even though they do not qualify as "acceptable medical sources[,]" are "important and should be evaluated on key issues such as impairment severity and

---

[18] The Court has reviewed this assessment and refers to it herein; although the signature is not entirely clear, it appears that the signatory is APRN Robert Krause.

functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, *3. These "[o]pinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. at *5. When analyzing these opinions, however, ALJs must apply the same factors used to evaluate "acceptable medical sources," such as the length of the treating relationship, how frequently the source has seen the individual, the degree to which the opinion is consistent with other evidence in the record, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion. *Id.* at *4.

In this case, there are no underlying treatment records from APRN Krause in the record, yet the ALJ relied on this opinion on grounds that the APRN treated the plaintiff "over a long period of time[,]" concluding that the APRN's opinion was "consistent with the longitudinal record." (Tr. 25). It was impossible for the ALJ to assess the consistency of this APRN's opinion with his treatment notes; therefore, it is impossible for this Court to assess whether the weight assigned by the ALJ is supported by substantial evidence. Moreover, although the defendant contends that the plaintiff's "argument offers 'no indication that [the APRN's records] contain significant information[,]'" (Def.'s Mem. at 14 (quoting *Morris v. Berryhill*, No. 16-2671-CV, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018)), the fact that the ALJ relied on APRN Krause's opinion in formulating his RFC assessment most certainly affected the outcome of the plaintiff's case.[19]

_____

[19] Separately, the plaintiff contends that there is evidence of the plaintiff's gastroenterology and rheumatology treatment that is missing from the record and that the ALJ erred in failing to secure these records. (Pl.'s Mem. at 10-

The ALJ's discussion of the other medical opinions in the record further undermines his treatment of APRN Krause's opinion. The ALJ granted "little weight" to the medical source statement of Tomaselli and Dr. Alexander, stating that "[i]t is reasonable to require a medical source, even a treating medical source, to provide a persuasive rationale supported by compelling evidence to justify his or her opinion[.]" (Tr. 29). The plaintiff was treated regularly at Fairfield Counseling from March 2012 to April 2013, the underlying records for which were before the ALJ. The ALJ, however, rejected this opinion based on the lack of underlying records and "compelling evidence[.]" (Tr. 29). Yet, as discussed above, the ALJ assigned "great weight" to an opinion of a provider who had no underlying treatment records.

Additionally, the ALJ expressly noted that he assigned "little weight" to the opinion of the plaintiff's treating cardiologist as he "did not give a function by function analysis of the effect of the claimant's impairments on his ability to function." (Tr. 27). Similarly, he assigned "little weight" (Tr. 27) or "no weight" (Tr. 23) to the opinion of Dr. Nowicki,[20] in part because Dr. Nowicki "did not offer a specific function by function analysis of the effect of the claimant's

---

11). However, unlike with the absence of the APRN's treatment records, the plaintiff does not explain how the absence of this evidence affected the ultimate decision by the ALJ, *see Rieces-Colon v.* Astrue, 523 F. App'x 796, 799 (2d Cir. 2013), or how these records reflected a disabling condition.

[20] In his decision, the ALJ explained that he granted "no weight" to the opinion of Dr. Nowicki, who testified that the plaintiff meets Listing 12.02B and C, because he is an internist and not a mental health specialist and because he did not treat the plaintiff for his "mental health problems." (Tr. 23, 27 (noting Dr. Nowicki's treatment of the plaintiff in 2008 and then 2010 for two to three times a year until 2014, for ailments such as respiratory infections, diarrhea, and binge drinking)); *see Selian*, 708 F.3d at 417 (addressing consideration of factors including the physician's specialty and treatment history). Additionally, the ALJ noted that the extensive treatment records from Fairfield Counseling Services do not reflect "the level of severity indicated in Dr. Nowicki's opinion." (Tr. 27; *see* Tr. 1377-91). The ALJ also explained that Dr. Nowicki's opinion regarding the decrease in the plaintiff's IQ score was undermined by Dr. Roginsky's examination during which he opined that the plaintiff did not put forth a good effort during the exam. (Tr. 28); *see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); see 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion."). However, in rejecting Dr. Nowicki's opinion, the ALJ pointed out that, while Dr. Nowicki's treatment records "consistently note the claimant's maladaptive use of alcohol[,]" the doctor "failed to address the claimant's maladaptive use of alcohol and its effect on the claimant's mental functioning." (Tr. 23; *see* Tr. 109-19, 935-37; see also Tr. 27-28). Thus, in reaching his conclusion regarding the weight he assigned to this treating physician's opinion, the ALJ relied on the absence of a functional assessment from Dr. Nowicki from which the ALJ could assess the plaintiff's RFC.

impairments on his ability to function." (Tr. 27). And, while he granted some weight to the neuropsychological examination report from Dr. Belliveau, he noted that Dr. Belliveau's opinion "provides little guidance" as to the plaintiff's limitations because the limitations Dr. Belliveau identified were "too vague to have significant probative value in determining the claimant's residual functional capacity." (Tr. 29). The ALJ, however, relied on the opinion of APRN Krause at least in part because it included a "specific function by function analysis of the claimant's impairments[,]" and the ALJ incorporated those limitations into his RFC finding. (Tr. 29).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant is represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128. The regulations provide that the Social Security Administration "will request a medical source statement about what you can still do despite your impairment(s)." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting former 20 C.F.R. § 404.1513(b)(6)) (additional citation omitted).[21] The Second Circuit has explained that the "plain text . . . does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity. The regulation thus seems to impose on the ALJ a duty to solicit such medical opinions." *Id.* (quoting former 20 C.F.R. § 404.1513(b)(6)) (additional citation omitted) (emphasis in original).[22] "The need to obtain medical source statements from a claimant's treating physicians is particularly acute, because SSA

---

[21] The changes to this section were effective on March 27, 2017; the ALJ's October 27, 2015 decision was issued prior to these changes.

[22] *See also* 20 C.F.R. § 404.1520b (providing that an ALJ may, but is not obligated to, re-contact a treating physician, and providing for such measures only when the existing record evidence is inconsistent or insufficient to make a disability determination); *see* 77 Fed. Reg 10, 651-01 (promulgating new regulations, effective March 26, 2012, amended 20 C.F.R. § 404.1512 to remove former subsection (e)).

regulations give the opinions of treating physicians 'controlling weight,' so long as those opinions are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record.'" *DeLeon v. Colvin*, No. 15 CV 1106(JCH), 2016 WL 3211419, at *3 (D. Conn. June 9, 2016) (quoting 20 C.F.R. § 416.927(c)(2) (additional citation omitted). The regulations provide that the medical reports '"*should* include . . . [a] statement about you can still do despite your impairment,' not that they *must* include such statements." *Tankisi*, 521 F. App'x at 33, (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (emphasis added)). However, as the Second Circuit also acknowledges, the regulations state that '"the lack of the medical source statement will not make the report incomplete.'" *Id.,* (quoting 20 C.F.R. § 404.1513(b)(6)) (additional citation omitted); *see Swiantek v. Comm'r Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015)(summary order) ("Although the Social Security regulations express a clear preference for evidence form the claimant's own treating physician over the opinion rendered by the consultative examiner . . . , this Court does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination."). Thus, the regulations, "[t]aken more broadly, . . . suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi*, 521 F. App'x at 34.

The issue as to whether a treating physician's opinion is necessary "focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record[.]" *Sanchez*, 2015 WL 736102, at *5. Remand is generally not necessary when the record contains sufficient information from which the ALJ can assess a claimant's residual functional capacity, and when

the record contains an assessment of a claimant's limitations from at least one treating physician. *See Downes v. Colvin*, No. 14 CV 7147(JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (citing *Tankisi*, 521 F. App'x at 34); *see Perez*, 77 F.3d at 47-48. Thus, "assessing whether it was legal error for an ALJ to fail to request a medical source statement from a claimant's treating physician is a case-specific inquiry." *DeLeon*, 2016 WL 3211419, at *4.

In this case, as discussed above, the ALJ repeatedly notes the absence of the functional assessments from the plaintiff's providers and examiners. Additionally, the ALJ states in his decision that the "[m]ore recent evidence submitted at the Appeals Council and hearing levels is inconsistent[]" as it relates to the plaintiff's memory, concentration and cognition. (Tr. 25). In the face of the inconsistencies, the ALJ concluded that the evidence "suggest[s] the claimant would struggle in performing complex tasks, but it also suggests that he has the capacity to perform simple, routine tasks." (Tr. 25). The ALJ is correct that there are inconsistencies in the medical evidence, yet the ALJ did not reconcile these inconsistencies. *See Selian*, 708 F.3d at 419. Instead, he selectively chose portions of the record to support his conclusion, rather than seeking out "medical source statements about what the claimant can still do despite [his] impairments[,]" as directed by the Appeals Council. (Tr. 231). The ALJ did not obtain the functional assessments, and yet emphasized the impact that the absence of such assessments had in reaching his conclusion.

In this case, unlike in *Tankisi*, the medical records do not include assessments of the plaintiff's limitations from a treating physician. *Tankisi,* 521 F. App'x at 33–34; *see also Perez,* 77 F.3d at 48. In addition to the early counseling records, following the Appeals Council's remand, the plaintiff was seen regularly by Dr. Jean for depression and anxiety. In October 2014, Dr. Jean noted that, although the plaintiff was taking classes to obtain his CPA, he was not doing well due to poor memory. (Tr. 1384, 1386). Her treatment records reveal repeated reports of

poor concentration and confusion (Tr. 1384, 1386), distraction (Tr. 1386), difficulty processing information (Tr. 1386), and forgetfulness (Tr. 1386).   Dr. Jean's diagnoses were bipolar disorder (unspecified); panic disorder with agoraphobia; generalized anxiety disorder; and alcohol dependence (Tr. 1384), and she noted that the plaintiff's "forgetfulness and decrease [in] executive function [were] concerning." (Tr. 1386).   Additionally, records from Dr. Jean in March 2015 reveal complaints of worsening depression, concentration, and energy level (Tr. 1388), decreased memory (Tr. 1388) and social isolation (Tr. 1388). Though the plaintiff reported improvement in his mood in April and May 2015 (Tr. 1390-91), his memory continued to decline such that Dr. Jean opined that his "impaired cognitive function and periods of confusion interfere with his ability to function in a work place[.]" (Tr. 1391).   These records, however detailed, do not reflect assessments of the plaintiff's work-related limitations.

Additionally, the consulting physicians and psychologists examined the plaintiff on one occasion, *see Tankisi*, 521 F. App'x at 34 (consulting physician examined Tankisi twice), and as referenced above, the ALJ concluded that Dr. Belliveau's opinion, which was the only consultative opinion issued after the remand order,[23] "provides little guidance" as to the plaintiff's limitations because the limitations Dr. Belliveau identified were "too vague to have significant probative value in determining the claimant's residual functional capacity." (Tr. 29).[24]   As the

---

[23] In addition to Dr. Belliveau's evaluation, the ALJ considered consultative evaluations of Dr. Roginsky and Dr. Bobulinski, neither of which included opinions as to the plaintiff's functional limitations. *See* Section II.B. *supra*.

[24] As discussed above, Dr. Belliveau performed a neuropsychological examination which revealed "cognitive inefficiency[,]" but a full scale IQ of 98, average attention and concentration abilities, average range intellectual functioning, and no indication of a clinically significant memory impairment.  (Tr.  1141-42). During the evaluation, Dr. Belliveau observed that the plaintiff had "no difficulty maintaining alertness[,]" his speech was normal, and his thought processes coherent and goal directed. (Tr. 1140-41). Dr. Belliveau concluded:

> This gentleman has Bipolar Disorder with at least intermittent hypomanic features, and a high level of anxiety. It is highly likely that his mood and anxiety disorders would interfere with his occupational functioning. These conditions would interfere with his ability to consistently maintain a reasonable pace and productivity in a competitive work environment, interfere with his ability to

Second Circuit has explained, "[T]he opinions of consulting physicians . . . generally have less value than the opinions of treating physicians . . ." *Tankisi*, 521 F. App'x at 34 (citation and internal quotations omitted), which is why "[t]he opinion of the treating physician is of particular importance to the determination of disability, including the claimant's RFC." *Moreau v. Berryhill*, No. 3:17-CV-00396 (JCH), 2018 WL 1316197, at *7 (D. Conn. Mar. 14, 2018) (citing *Hallet v. Astrue*, No. 3:11-cv-1181, 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (distinguishing the perspective of the treating physician from that of the examining physician)); *see also Hallet*, 2012 WL 4371241, at *6 (noting that "[b]ecause the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician.").

Thus, the record cannot be considered adequate to permit an informed finding by the ALJ of the plaintiff's RFC, and remand is warranted. *See Moreau*, 2018 WL 1316197, at *10 (citing *Sanchez*, 2015 WL 736102, at *6); *see also Messina v. Comm'r of Soc. Sec.*, 17-cv-1598, ___ F. App'x ___ (2d Cir. Sept. 5, 2018) (summary order). The ALJ repeatedly acknowledged that he lacked function by function analyses in the medical record and decided to apply the greatest weight on the one such analysis in the record which was not made by a treating source and which is not supported by any treating records from that provider.

D.    REMAINING ARGUMENTS

In light of the conclusion reached in Section IV.C. *supra*, the Court need not address the plaintiff's remaining arguments as, upon remand, the ALJ must solicit opinions about the

---

adaptively respond to changing demands in the work environment, and interfere at least intermittently with his ability to effectively manage interpersonal aspects of the work environment. (Tr. 1143).

plaintiff's functional abilities with and without substance use, and then consider that information in formulating his RFC assessment, which will require additional vocational findings.

V.      CONCLUSION

        Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) is *granted such that the matter is remanded for further proceedings consistent with this Ruling*, and the defendant's Motion to Affirm (Doc. No. 29) is *denied*.

        Dated this 6th day of September, 2018 at New Haven, Connecticut.

                                                     /s/ Robert M. Spector, USMJ
                                                    Robert M. Spector
                                                    United States Magistrate Judge